MOUNTAIN CITY COPPER CO. v. KORTH.

Civ. No. 934.

District Court, D. Utah, Central Division.

March 2, 1948.

Additional Findings April 12, 1948.

Van Cott, Bagley, Cornwall & McCarthy, of Salt Lake City, Utah, for plaintiff.

Scott M. Matheson, Asst. U. S. Dist. Atty. for District of Utah, of Salt Lake City, Utah, for defendant.

JOHNSON, District Judge.

This case came on duly for hearing January 19th to January 22nd, 1948. Evidence was adduced, a stipulation of facts marked Exhibit 1 was introduced and admitted in evidence and the issues stated in the Pretrial Orders, agreed to by both parties to be satisfactory, were submitted for decision. The court being now fully advised makes the following:

### Findings of Fact

1. When plaintiff acquired the mining property in question from Rio Tinto Mining Company the latter had developed the mine by means of the No. 1 inclined shaft to the 200' level where it had encountered rich ore; had some limited development workings on the 200' level consisting of drifts and crosscuts, inadequate to outline and determine the extent of the ore body; to ascertain the characteristics, values, manner of occurrence, continuity, or distribution of values in the ore; to ascertain the nature of the hanging and foot walls and the nature generally of the country rock containing the ore body or bodies.

2. At the time of acquisition of the mine, the management of Mountain City Copper Company concluded that in order to make maximum recoveries of the values in the mine, it was necessary to reach reliable conclusions:—as to how to mine the ore bodies; as to whether a concentrating mill would be economically desirable, and, if so, what its characteristics and capacity should be; as to how large a camp for living quarters for personnel should be built which would depend in large part upon the method of mining and what kind and capacity of mill, if any, determined upon; and as to the securing of essential roads and equipment to transport ores and concentrates to railheads for carriage to smelter; and that in order to reach such conclusions it was essential to outline and determine the extent and continuity of the ore body; to ascertain the values and distribution of values in the ore body; to ascertain the metallurgical characteristics of the ore; to ascertain the nature of the walls and the physical characteristics both of the country rock and the ore body; and to ascertain the effect of strong cross faults on the ore occurrence and on the structural strength of the ore.

3. From acquisition through February 16, 1936, plaintiff excavated shafts, drifts, crosscuts, raises, winzes and drilled diamond-drill holes. The original No. 1 Shaft was enlarged and retimbered for 241 feet and was sunk an additional 251 feet in 1932 and 1933, completing it to the 400' level. The No. 2 vertical shaft ($3\frac{1}{2}$ compartments) was sunk 583.1 feet in 1933 and 1934, completing it to the 500' level. During the first half of 1935 a winze was sunk from the 500' level to the 600' level. Through September 30, 1935, the total footage excavated amounted to 8743.6 linear feet, including 241 feet of shaft enlarging, 834.1 feet of shaft sinking, 200.5 feet of winzing, 3337 feet of drifting, 155.5 feet of raising and 3975.5 feet of crosscutting. Of this total footage (8743.6 feet), 1103.5 feet were advanced in ore and 7640.1 feet in waste. Shaft stations and sumps were also excavated. The total cost of the above work through September 30, 1935 was $376,236.00 and total costs to September 30, 1935 for mines and mining claims, excavations, equipment, supplies, etc., was $867,282.00. The work above described was carried on continuously into and through the period between October 1, 1935 and February 16, 1936, during which latter period the total advance amounted to 1648 linear feet, of which 1333.5 feet were in ore and 314.5 feet in waste.

4. The management on October 1, 1935 knew that the ore body contained two

classes of ore; one of such character or richness that it would yield the most profit by being shipped without treatment or concentration directly to the smelter, hereinafter called "shipping ore"; the other of different character or lesser value which could be profitably exploited only by concentrating it in a mill or which could be more profitably exploited by concentrating it in a mill, hereinafter called "milling ore"; that the ores could not be classified as between shipping and milling ores solely on the basis of copper content, but that certain metallurgical characteristics of certain ore made it more profitable to mill high grade ore and that other metallurgical characteristics made it more profitable not to mill certain comparatively low grade ore but to ship it directly for smelting, and that these two classifications of ore to an undetermined extent did not occur regularly and separately in large blocks but were to an undetermined extent intermingled in an erratic fashion.

5. On October 1, 1935 plaintiff had not secured the information which it considered necessary as described in Finding of Fact No. 2 herein; but considered that it was necessary, in order to prevent the possibility of uneconomical exploitation of the mine to gain further information:—as to the way in which the two classes of ore were intermingled; as to whether the profitable ore body was continuous or whether parts of it were economically barren between the 200' and 300' levels and between the 300' and 400' levels; as to the size, shape and extent of the ore body; as to the characteristics of the ore body and whether it would stand or cave, thus requiring square set timbering to hold it and prevent serious losses in value due to adulteration with lower grade ores or waste rock; and as to the characteristics of the foot-wall and hanging wall and other country rock containing the ore body including knowledge as to whether or not the containing country rock would stand or cave thus adulterating the ore and requiring the support by timbering of such of the country rock as might cave and fall; as to how to mine the ore body, whether by top slicing, cut and fill or square set timbering methods; as to whether a concentrating mill should be built, and, if so, of what kind and capacity; based upon the decisions as to the mining and milling, the number of men that should be employed and the necessary facilities for housing and feeding of the men and such of them as had families; the method of transportation of ores and concentrates to the smelter, the number of trucks necessary therefore and the securing of suitable roads to railhead; and, if there was to be a mill, how to achieve a balanced operation as between shipping ore and milling ore so that there would be constant and adequate milling ore feed for the mill and constant and adequate shipping ore and concentrates for the trucks, thus preventing idle periods either in the mill or with the trucks, idleness of either or both being against the interests of economical and profitable operation of the mine.

6. The management decided, prior to October 1, 1935, to secure the above described information by: continuing drifts and cross cuts on the 300' and 200' levels and by widening the 201 drift; by the driving of raises between levels in various parts of the ore body, three raises to be driven on the 400' level to the 300' level and four raises from the 300' level to the 200' level; by driving such drifts and cross cuts from the raises as would be decided; and on October 1, 1935 427 and 428 raises had been started and advanced two floors above the sill on the 400' level. The square set timbering method of advancing the raises was adopted because it was believed that the ore body in certain places would not stand without timber support and this method provided the flexibility of operation that would furnish the maximum amount of information from these workings.

7. During the period October 1, 1935 to February 16, 1936 the 427 and 428 raises were completed between the 400' and 300' levels, the 430 raise was driven to the sixth floor above the 400' level; the 309, 311 and 312 raises were completed between the 300' and 200' levels; the 320 raise was driven two floors above the 300' level; the total number of feet of drifts driven was 575 feet, of cross cuts 527 feet, of raises 546 feet; from these workings 23, 745.51 wet tons of ore were extracted by

nonselective mining methods of which 22,-994.87 (of which between 4545 and 7300 tons from the raises and 11,500 tons from all the workings was not, on its own merits, of shipping grade value, which resulted in a loss of values and profits on this tonnage to the extent of approximately $5.00 per ton or a total of approximately $57,-500.00) were shipped directly to the smelter and 750.64 were stockpiled to await milling if a mill were decided upon; this ore was extracted 23.65% from drifts, 4.26% from crosscuts and 72.09% from raises.

8. The workings during the period October 1, 1935 to February 16, 1936 were development workings driven in good faith for the necessary purpose of securing the additional information described in Finding of Fact No. 5 and the management was actuated as to the location of the workings and the size of the workings by the desire and necessity of securing such information and not for the purpose of securing profits from the extraction of high grade ores which were incidental to the development work.

9. The management secured from the workings driven during the period October 1, 1935 to February 16, 1936 and the metallurgical and mill testing of extracted ores all of the required information, in addition to what it had acquired prior to said period, and thereby was enabled to make the decisions described in paragraph 2 of the Findings of Fact; eliminated as methods of mining the ore bodies the "top slice" and "cut-fill" methods and decided to start mining at the foot wall and advance toward the hanging wall; determined that the different classes of ore, shipping and milling, were intermingled in the ore body so erratically that it would be impossible to extract them in separate operations at successive times, that selective mining was essential so that the shipping ore would be broken separately from the milling ore and brought to the surface separately; that the mining should be done by the square set method and that there must be a mill so that the milling ore could be promptly treated; and that a balanced operation would feed a 300 ton per day mill for concentration by the flotation method.

10. Approximately four days prior to February 17, 1936 the management decided that the mining method would be selective by the square set method; that the milling ore would be concentrated in a 300 ton per day mill by flotation process; that such mining and milling would require a certain number of mining and milling personnel. Shortly after February 16, 1936 it was decided upon what housing and boarding facilities would be required for such personnel and their families and the size and character of the camp was decided upon.

11. During the latter part of the period October 1, 1935 to February 16, 1936, the extent of the ore body became sufficiently well known so that representations could be made to Governmental bodies as to the size of the operation and minimum amounts of ore and concentrates to be hauled and after February 16, 1936 the management succeeded in inducing Governmental bodies to construct suitable roads for such haulage.

12. On February 17, 1936 plaintiff commenced the excavation of the first stope, the first mine working having for its purpose the extraction of ore from a developed ore body which did not become developed until February 16, 1936. Ground was broken for the mill in March, 1936 and the mill went into operation in September, 1936.

13. On October 1, 1935 plaintiff's excess of expenditures for development work over net receipts from the sale of minerals extracted from development workings was $376,236.00. On February 16, 1936 such excess was reduced to $108,430.56. The development account was closed out by transfer of this balance to ore inventory on hand as of February 16, 1936.

14. Plaintiff capitalized expenditures on the mine by charging the monthly amounts to Mine Development. During the period, October 1, 1935 to February 16, 1936, each month there was an excess of receipts from sales of ore over all expenditures on the mine which was credited by plaintiff to Mine Development, reducing the balance of said account. This Mine Development Account, as carried on plaintiff's books, is summarized in the next paragraph.

15. The Mine Development Account as carried on plaintiff's books may be summarized as follows, to wit: tracted from plaintiff's said mine were from workings, which were driven for the purpose of development.

| | | | |
|---|---|---|---|
| 10/18/32 to 12/31/34 | Excess of expenditures over ore receipts | | $276,845.32 |
| 1/1/35 to 9/30/35 | Excess of expenditures over ore sales | | 99,390.68 |
| 9/30/35 | Balance | | $376,236.00 |
| 10/1/35 | Excess receipts from ore over expenditures for October | $112,152.74 | |
| 11/30/35 | Excess receipts from ore over expenditures for November | 89,634.87 | |
| 12/31/35 | Excess receipts from ore over expenditures for December | 54,897.41 | |
| 10/1/35 to 12/31/35 | Total | | (256,685.02) |
| 12/31/35 | Balance | | $119,550.98 |
| 1/31/36 | Excess of receipts from ore over expenditures for January | 9,622.27 | |
| 2/16/36 | Excess of receipts from ore over expenditures for February | 22,217.80 | |
| 2/16/36 | Total | | ( 31,840.07) |
| 2/16/36 | Balance | | $ 87,710.91 |
| 11/30/36 | Retroactive entry for expenses prior to 2/16/36 | | 20,719.65 |
| | Balance used as inventory of ore on hand as of 2/16/36 | | $108,430.56 |

16. The period of development of plaintiff's said mine continued until February 16, 1936 and did not expire on September 30, 1935.

17. Plaintiff's said mine did not pass from the development status to the production status until February 17, 1936.

18. During the period October 1, 1935 to February 16, 1936 all of the ores ex-

19. During the period October 1, 1935 to February 16, 1936 the principal activity of plaintiff's said mine was the development of additional ores for mining and not the production of developed ores.

## Conclusions of Law

Pursuant to the Findings of Fact on file herein the Court now draws the following Conclusions of Law:

■ 1. Treasury Regulations 86, Article 23(m)–15(a), promulgated under the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 664 ct seq., reading as follows:

"All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining."

is a valid regulation and this case must be decided according to its provisions.

■ 2. The phrase in the first sentence of said regulation reading, "while the mine is in the development stage," refers to the entire development period and not to any segment thereof and accordingly all net receipts from minerals extracted from the mine during the entire development period are to be deducted from all expenditures for development during the entire period and constitute a return of capital invested in development up to the full amount of such expenditures for development.

■ 3. Net receipts from the sales of minerals extracted from workings during the development period constitute income and would be includible as part of gross income except that the regulation set forth in paragraph 1 of these Conclusions of Law provides for the deduction of net receipts from minerals sold from total expenditures for development during the development period and thus under said regulation said net receipts constitute return of capital expended for development. The treatment of said net receipts fully to return to plaintiff capital invested in development during the development period was legal and valid.

4. The question of whether the mine had passed from the development to the production status must depend upon whether during such period the major portion of the mineral production is obtained from workings other than those opened for the purpose of development or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining and not according to whether or not there was an excess of net receipts from the sales of minerals extracted from plaintiff's said mine over expenditures for development during said period.

5. The question of whether the mine had passed from the development to the production status must depend upon whether during such period the major portion of the mineral production is obtained from workings other than those opened for the purpose of development or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining and not according to whether or not during each full month from October 1, 1935 through January, 1936 and in the part of the month February 1 to February 16, 1936 there was an excess of net receipts from the sales of minerals extracted from plaintiff's said mine over expenditures for development.

■ 6. During the period October 1, 1935 to February 16, 1936 all the ores extracted from plaintiff's said mine were from workings which were driven for the purpose of development.

7. During the period October 1, 1935 to February 16, 1936 the principal activity of plaintiff's said mine was the development of additional ores for mining and was not the production of developed ores.

8. The period of development of plaintiff's said mine continued until February 16, 1936 and did not terminate on September 30, 1935.

9. Plaintiff's said mine did not pass from the development status to the production status until February 17, 1936.

■ 10. All amounts of taxes and interest thereon to date of payment, exacted by defendant and paid by plaintiff on account of the decision of the Commissioner of Internal Revenue that the mine passed from the development status to the production status on October 1, 1935 and that

254

it was in the production status from October 1, 1935 to February 16, 1936, were illegally exacted and the plaintiff is entitled to judgment therefor together with interest at 6% from the date when paid.

Additional Findings of Fact and Conclusions of Law

Defendant, pursuant to the stipulation of the parties recited in the Order Respecting Findings of Fact, Conclusions of Law and Judgment dated March 2, 1948, has furnished a recomputation of the taxes for the several years involved purporting to give effect to the decision and Findings of Fact and Conclusions of Law of this court and plaintiff has acquiesced therein. Accordingly the court now finds the following additional facts:

20. The following is a correct recomputation of plaintiff's income taxes for the years 1935, 1936, 1937, 1938 and 1939:

## 1935

| | Tax | Interest |
| --- | --- | --- |
| Income Tax Assessed: | | |
| Original, Account #NC–86181 | None | None |
| Additional, April 30, 1943, AP–521500 | $31,815.49 | $13,600.03 |
| Total Assessed | $31,815.49 | $13,600.03 |
| IncomeTax Paid: June 12, 1943 | $31,815.49 | $13,600.03 |
| Unpaid assessment to be abated | None | None |
| Income tax paid | $31,815.49 | $13,600.03 |
| Income tax liability | None | None |
| Overpayment | $31,815.49 | $13,600.03 |

Aggregate of overpaid taxes and interest paid by plaintiff $45,415.52.

## 1936

| | Tax | Interest |
| --- | --- | --- |
| Income Tax Assessed: | | |
| Original, Account #40703 | $ 85,359.45 | None |
| Additional, April 30, 1936, AP–521501 | 17,117.55 | $ 6,290.11 |
| Total assessed | $102,477.00 | $ 6,290.11 |
| Income Tax Paid: | | |
| March 15, 1937 | 21,422.71 | None |
| June 15, 1937 | 21,257.01 | None |
| September 16, 1937 | 21,339.86 | None |
| December 15, 1937 | 21,339.87 | None |
| June 12, 1943 | 17,117.55 | 6,290.11 |
| Total paid | $102,477.00 | $ 6,290.11 |
| Unpaid assessment to be abated | None | None |
| Income tax paid | $102,477.00 | 6,290.11 |
| Income tax liability | 100,083.84 | 5,410.71 |
| Overpayment | $ 2,393.16 | $ 879.40 |

Aggregate of overpaid taxes and interest paid by plaintiff $3,272.56.

### 1937

Income Tax Assessed:

| | | |
|---|---|---|
| Original, Account #40895 | $137,743.88 | None |
| Additional, April 30, 1943 AP–521502 | 32,841.79 | $10,097.72 |
| | | |
| Total assessed | $170,585.67 | $10,097.72 |

Income Tax Paid:

| | | |
|---|---|---|
| March 15, 1938 | $ 34,435.97 | None |
| June 14, 1938 | 34,435.97 | None |
| September 15, 1938 | 34,435.97 | None |
| December 16, 1938 | 34,435.97 | None |
| June 12, 1943 | 32,841.79 | $10,097.72 |
| | | |
| Total Paid | $170,585.67 | $10,097.72 |
| Unpaid assessment to be abated | None | None |
| Income tax paid | $170,585.67 | $10,097.72 |
| Income tax liability | 170,472.28 | 10,062.86 |
| | | |
| Overpayment | $ 113.39 | $ 34.86 |

Aggregate of overpaid taxes and interest  paid by plaintiff $148.25.

### 1938

Income Tax Assessed:

| | | |
|---|---|---|
| Original, Account #40302 | $ 8,728.96 | None |
| Additional, April 30, 1943 AP–521503 | 2,941.91 | $ 728.03 |
| | | |
| Total assessed | $11,670.87 | $ 728.03 |
| Less: Overassessment May 22, 1945 | 351.17 | 86.90 |
| | | |
| Net tax assessed | $11,319.70 | $ 641.13 |

Income Tax Paid:

| | | |
|---|---|---|
| March 15, 1939 | $ 2,182.24 | None |
| June 15, 1939 | 2,182.24 | None |
| September 14, 1939 | 2,182.24 | None |
| December 13, 1939 | 2,182.24 | None |
| June 12, 1943 | 2,941.91 | $ 728.03 |
| | | |
| Total Paid | $11,670.87 | $ 728.03 |
| Less: Overassessment May 22, 1945 | 351.17 | 86.90 |
| | | |
| Net tax paid | $11,319.70 | $ 641.13 |
| Unpaid assessment to be abated | None | None |
| Income tax paid | $11,319.70 | $ 641.13 |
| Income tax liability | 11,288.43 | 633.39 |
| | | |
| Overpayment | $ 31.27 | $ 7.74 |

Aggregate of overpaid taxes and interest paid by plaintiff $39.01.

## 1939

| | | |
|---|---|---|
| Income Tax Assessed: | | |
| Original, Account #40370 | $50,382.39 | None |
| Additional, April 30, 1943, AP–521504 | 8,558.62 | $1,604.44 |
| Total assessed | $58,941.01 | $1,604.44 |
| Less: Overassessment May 25, 1945 | 1,008.73 | 189.10 |
| Net tax assessed | $57,932.28 | $1,415.34 |
| Income Tax Paid: | | |
| March 15, 1940 | $12,595.60 | None |
| June 15, 1940 | 12,595.60 | None |
| September 16, 1940 | 12,595.60 | None |
| December 16, 1940 | 12,595.59 | None |
| June 12, 1943 | 8,558.62 | $1,604.44 |
| Total Paid | $58,941.01 | $1,604.44 |
| Less: Overassessment May 27, 1945 | 1,008.73 | 189.10 |
| Net tax paid | $57,932.28 | $1,415.34 |
| Unpaid assessment to be abated | None | None |
| Income tax paid | $57,932.28 | $1,415.34 |
| Income tax liability | 57,791.22 | 1,388.90 |
| Overpayment | $ 141.06 | $ 26.44 |

Aggregate of overpaid taxes and interest paid by plaintiff $167.50.

21. The aggregate of all overpaid taxes and interest thereon paid by plaintiff on June 12, 1943 for the years 1935, 1936, 1937, 1938 and 1939 is $49,042.84; interest thereon from date when paid is at the rate of $8.0618 per day and through April 11, 1948 amounts to $14,237.11; and the total amount of overpaid taxes and interest paid by plaintiff, together with interest thereon at 6% per annum from June 12, 1943 through April 11, 1948 is $63,279.95.

### Conclusions of Law

Pursuant to the Findings of Fact herein the Court draws the following Conclusions of Law.

11. Plaintiff is entitled to judgment against defendant for $49,042.84 together with interest thereon after June 12, 1943 at the rate of $8.0618 per day to a date thirty days prior to the date of the refund check as provided for in 28 U.S.C.A. § 284, as amended June 22, 1936, Chapter 690, Section 808, 49 Statutes at Large 1746, which said $49,042.84 together with said interest through April 11, 1948 aggregate on date hereof $63,279.95.

### Judgment

This case came on duly for trial January 19th to January 22, 1948. The court has made Findings of Fact and Conclusions of Law. Pursuant thereto:

It is hereby ordered and adjudged that plaintiff have and recover from defendant $49,042.84 together with interest thereon after June 12, 1943 at the rate of $8.0618 per day to a date thirty days prior to the date of the refund check as provided for in 28 U.S.C.A. § 284, as amended June 22, 1936, Chapter 690, Section 808, 49 Statutes at Large 1746, which said $49,042.84 together with said interest through April 11, 1948 aggregate on date hereof $63,279.95.